IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs May 7, 2019

**RANDY JACKSON v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
No. 13-02387          **Chris Craft, Judge**

_____

**No. W2018-01644-CCA-R3-PC**

_____

Petitioner, Randy Jackson, was convicted of aggravated robbery and attempt to commit aggravated robbery and received an effective twenty-two-year sentence. He appeals the denial of his petition for post-conviction relief in which he alleged ineffective assistance of counsel at trial. After a thorough review of the record, we conclude that Petitioner has failed to show that his trial counsel rendered ineffective assistance of counsel, and we accordingly affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR. and D. KELLY THOMAS, JR., JJ., joined.

Sharon Fortner, Memphis, Tennessee, for the appellant, Randy Jackson.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Assistant Attorney General; Amy P. Weirich, District Attorney General; and Leslie Byrd, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

*Background*

The facts of this case as set forth by this court on direct appeal are as follows:

This case relates to the 2012 robbery of John Vogel and Scarlett Densmore outside Mr. Vogel's home. At the trial, Mr. Vogel testified that on the evening of July 23, 2012, he and Ms. Densmore, the mother of his daughter, were standing outside his home near Ms. Densmore's minivan when an African-American man approached them. Mr. Vogel

said that although he saw the man about eighty yards away, Mr. Vogel did not think much of it. He said that as he and Ms. Densmore were talking, the man began running toward them with a gun. Mr. Vogel said that he told Ms. Densmore to lie on the ground, that he lay on the ground and covered his head with his hands, and that he heard the man asking Ms. Densmore, "What have you got?" Mr. Vogel said that after about thirty seconds, he felt the barrel of the man's gun on his neck and that the man yelled, "What have you got motherf ——? I will shoot your motherf —— a—." Mr. Vogel said he thought he was going to die. Mr. Vogel said that the man slightly pulled down Mr. Vogel's pants to determine if Mr. Vogel "had anything" and that Mr. Vogel told the man, "Man, I don't have anything." Mr. Vogel said that the man held the gun in his right hand and that the gun was a black semi-automatic pistol. He said the man wore a "doo rag," was six feet, two inches tall, and weighed about 170 pounds. He could not recall the man's hairstyle.

Mr. Vogel testified that he next heard the man talking to Ms. Densmore and rummaging through her purse. He said that after three minutes, he heard a car arrive, saw a man get out of the car, and heard the man ask, "Are we done here?" Mr. Vogel said that Ms. Densmore was crying and asked what she should do and that he told her to remain on the ground. Mr. Vogel said that he heard the car's engine start and drive away and that he got up and attempted to obtain the car's license plate number. He said, though, the car did not have a license plate. He said the car was "reddish."

Mr. Vogel testified that after the car drove away, he grabbed his car keys and attempted to follow the car. He said that he and Ms. Densmore got in his car, chased the reddish-colored car, caught up to the reddish-colored car, passed the car, made a u-turn, and began following the car. He said that the car drove into a Kroger parking lot and that he parked his car where he could watch. He said he called 9-1-1 and told the dispatcher about the incident, reported he was watching the reddish-colored car, and requested police assistance. He said that while he was waiting for the police, the reddish-colored car left the parking lot and drove away on a road that was "destitute and dark." Mr. Vogel did not follow the car but reported to the dispatcher the direction in which the car drove. He said the police arrived and apprehended "one of the subjects." He identified a photograph of the reddish-colored car, which depicted no license plate. He said that although he was provided a photograph lineup, he was unable to identify the man who pointed a gun at him outside his home.

On cross-examination, Mr. Vogel testified that the street lights were operating outside his home, that the reddish-colored car did not speed when it left the scene, and that the car drove away slowly.

Scarlett Densmore testified that on July 23, 2012, at 10:45 p.m., she and Mr. Vogel were talking outside Mr. Vogel's home and that a man ran from across the street to their location. She said the man pointed a gun at her and Mr. Vogel. She said the man was African-American, tall, and wore "long jeans," a mostly white shirt, and a doo rag on his head. She said she saw braids coming out of the doo rag. She said that the man yelled for her and Mr. Vogel to "get down on the ground," that the man pointed the gun at her and Mr. Vogel, and that they complied. She said she first saw the man when he was running across the street and under a street light. She identified the Defendant as the man she saw running across the street and said she had no doubt it was the Defendant who robbed her.

Ms. Densmore testified that during the incident, a car arrived and parked beside her minivan, that a man got out of the car, that the man told her and Mr. Vogel to lie on the ground, that the man climbed on her back and looked though her pockets, and that she only saw the man's legs and feet. She said that the man took her keys and asked for her money. She said that she told the man to take her purse, that the man asked for her money again, and that she told him her money was in her purse. She said the man wore long jean shorts that came "half-way in between" and dark gray and turquoise tennis shoes. She said that although her arms were scraped from the gravel on the ground, she did not suffer serious injury during the robbery. She noted the car was a reddish-maroon four-door sedan.

Ms. Densmore testified that after the men left in the reddish-colored car, Mr. Vogel called 9-1-1 and that she and Mr. Vogel chased the men. She provided testimony similar to Mr. Vogel regarding the chase and said the police stopped the reddish-colored car and took one of the men into custody. She said that the man lying on the ground as the police apprehended him was the man who arrived outside Mr. Vogel's home in the reddish-colored car and who "had been on [her]" because she recognized the man's legs.

Ms. Densmore testified that her keys and her purse, which contained money, photographs of her children, medication, and miscellaneous items, were taken during the robbery. She noted her purse was large, red, and shiny. She said the police found her purse in a dumpster near

- 3 -

the area where the man was apprehended. She identified photographs of her purse after it was recovered and noted her purse contained her wallet, driver's license, and receipts.

Ms. Densmore testified that the police provided her a photograph lineup, that she circled one photograph, and that she "believed" the man in the photograph was the man who pointed a gun at her and took her purse.

On cross-examination, Ms. Densmore testified that Mr. Vogel was the first person to tell her to lie on the ground. She said the gun was black and gray and was a semi-automatic pistol. She agreed that the incident occurred quickly and said that after she lay on the ground, she was unable to move or look around and only saw the lower portion of the men's bodies. She said that during the chase, she and Mr. Vogel pulled beside the reddish-colored car and that she did not look inside the car because she was scared.

On redirect examination, Ms. Densmore testified that when she said "believed" during her photograph identification, she meant "believe within a certainty." She said she understood from the advice to witnesses form that she was not supposed to guess when identifying the suspects. She said she had no doubt that the Defendant was the person who ran from across the street and initiated the robbery.

Memphis Police Officer Vonzell Bibbs testified that he and Officer Errol Freeman received a report regarding a robbery and were told the victims were following a red vehicle related to the robbery. He said that the police dispatcher updated him and Officer Freeman about the car's location, that they saw the car, and that they initiated a vehicle stop. Officer Bibbs said that once the blue lights on the police cruiser were activated, the passenger got out of the car and ran. Officer Bibbs said that Officer Freeman detained the driver and that Officer Bibbs and another officer unsuccessfully attempted to apprehend the passenger. Officer Bibbs described the passenger as a skinny African-American male with long black hair. Officer Bibbs said the passenger took a quick glance toward him before fleeing the area.

Memphis Police Officer Justin Murray testified that he responded to the pursuit of the red car and that he assisted with the vehicle stop of the red car. He said that the Defendant was the passenger in the red car, that the Defendant fled on foot, that he chased the Defendant, and that he was unable to apprehend the Defendant during the chase. Officer Murray returned to the red car's location to assist the other officers who had

- 4 -

detained the driver. He said that the Defendant looked at him before running and that the Defendant was about fifteen to twenty feet away.

On cross-examination, Officer Murray testified that the Defendant fled from the car after Officer Murray activated the blue lights on his police cruiser. He said the Defendant ran around a building and jumped over a fence to get away from him and Officer Bibbs, who also chased the Defendant.

Memphis Police Officer Errol Freeman testified that when the passenger of the red car fled the scene of the vehicle stop, he detained the driver, who initially did not follow Officer Freeman's commands. Officer Freeman said he told one of the other officers at the scene to look inside the dumpster located behind a nearby building for the victim's belongings. Officer Freeman said that he searched the red car for the victim's purse and that during his search, he found a handgun under the driver's seat. He noted the handle of the handgun was visible from under the seat. He identified a photograph of the black and gray semi-automatic handgun.

Former Memphis Police Officer Jason Majewski testified that on July 24, 2012, he was asked by other officers to locate the Defendant, that he went to the Defendant's last known address, and that he spoke to the Defendant's mother. Mr. Majewski said that the Defendant's mother permitted them to enter her home, that he asked if the Defendant was home, and that the Defendant's mother said the Defendant was not there. Mr. Majewski said that he noticed the pull-down attic door was ajar, that he motioned toward the door, and that the Defendant's mother indicated the Defendant was in the attic. The Defendant was apprehended without incident.

Memphis Police Officer Eric Hutchinson testified that on July 23, 2012, he was a crime scene investigator and that he responded to where the red car was stopped by other officers. He stated that he found Ms. Densmore's purse inside a nearby dumpster. On cross-examination, Officer Hutchinson stated that the purse was returned to Ms. Densmore and that no fingerprint analyses were performed on the purse or its contents.

Memphis Police Officer Eric Carlisle testified that he was a crime scene officer and that he processed the red car for evidence. He identified photographs he took of the car and its contents. The photographs depicted a handgun under the front passenger seat, the .380–caliber

bullet inside the gun's chamber, the gun's magazine containing live rounds that was inserted into the gun, and a black doo rag containing three .380–caliber live rounds. Another photograph showed the rear of the red car, which reflected no license plate. Officer Carlisle noted the black doo rag was found under the front passenger seat beside the handgun.

Officer Carlisle testified that he attempted to obtain fingerprints on the handgun and the magazine clip but was unsuccessful and that he obtained fingerprints on the front driver's side door and the rear passenger door. He said, though, the fingerprints he obtained did not have enough ridge detail. On cross-examination, Officer Carlisle stated that the analyst who examined the latent fingerprints was able to identify prints belonging to Tommy Bridges and Tameka Martin.

On redirect examination, Officer Carlisle testified that the fingerprint analyst noted in his report that latent fingerprints were obtained from the car but that the person who left the prints inside the car was not identified because the owner or owners of those prints were not contained in any police database. On recross-examination, Officer Carlisle stated that Mr. Bridges' and Ms. Martin's fingerprints were identified based upon their previous arrest records.

The parties stipulated to the following facts:

> [T]hat on July 24, 2012 Officer E. Carlisle processed a red Pontiac Grand Prix for fingerprints. Then fingerprint lift cards bearing twelve transparent lifts were delivered to the Memphis Police Department Latent Fingerprint Section for examination.
>
> On July 25, 2012, Latent Fingerprint Examiner Marvin Milner determined that a print lifted from the exterior driver's door frame was the fingerprint of Tommy Bridges. . . . Examiner Milner also determined that a print lifted from the exterior right rear passenger door handle was the fingerprint of Tameka Martin....
>
> Additionally, there are latent prints of value that remain unidentified. The . . . report titled, Latent Fingerprint Section Memphis Police Department, and dated 7-25-2012, is the record of Examiner Milner's conclusions.

*State v. Randy Jackson*, No. W2015-02021-CCA-R3-CD, 2016 WL 1756018, at *1-4 (Tenn. Crim. App. Apr. 29, 2016).

*Post-Conviction Hearing*

Petitioner testified that trial counsel was appointed to represent him, and they did not get along well because of a lack of communication. He further testified: "We didn't have anything going on as far as him coming to visit me and to get my whereabouts or anything particularly toward the case." Petitioner agreed that trial counsel gave him discovery, but they did not review it. Petitioner testified that he read the discovery himself and learned what he was charged with and the names of the witnesses against him. He said that he talked to trial counsel about the accusations but nothing was done. Petitioner testified that he asked trial counsel to talk to specific witnesses. He said that trial counsel never met with him at the jail and that they only met during report dates at the courthouse. Petitioner testified that trial counsel only met with him a "handful" of times.

Petitioner testified that he and trial counsel discussed the potential sentence. He said: "And I'd approach him with the things that was brought forth on me as far as the charge and it was like he was blowing me off." Petitioner admitted that trial counsel discussed potential plea offers with him. He thought that the first offer was for twelve years and the second was for ten years. Petitioner understood that he would be facing a longer sentence if the case went to trial. However, he said: "I mean, if I'd known it would have been lesser time I wouldn't even went to trial, I wouldn't even went." Petitioner testified that he had never been to trial before, and he did not know how the court system worked. Trial counsel did not explain the process to him. Petitioner testified that trial counsel did not explain the plea offer or the potential range of sentence that he faced. He said that he did not understand that he could be sentenced on each count individually. He also did not understand concurrent and consecutive sentencing.

Petitioner testified that trial counsel went over the sentencing ranges with him but he did not review Petitioner's rights with him before the trial court advised Petitioner of his rights. Petitioner understood the sentence that he was facing, and the trial court also advised him of the potential sentence. He agreed that it was his choice and decision to go to trial. However, he and trial counsel did not discuss trial strategy or what would happen at trial. He understood that once his case was set for trial, he could not enter a guilty plea. Petitioner claimed that he did not have any confidence in trial counsel once the case was set for trial. He considered hiring private counsel but could not afford it. Petitioner admitted that he did not discuss his doubts with trial counsel. He did not feel that trial counsel did good job at trial.

Petitioner testified that he told trial counsel about alibi witnesses, which included his mother and sister. However, he claimed that trial counsel never investigated an alibi

defense or spoke with his mother and sister. He said that his mother and sister could have testified as to his whereabouts at the time of the offense. Petitioner testified that he wanted the witnesses to testify at trial but no one testified on his behalf. Petitioner did not feel that his trial went well or that trial counsel did much to represent him. He said that trial counsel only asked the State's witnesses a few questions on cross-examination, and he felt that trial counsel should have asked more questions. He also had a few questions that he wanted trial counsel to ask the witnesses. Petitioner testified that he discussed the questions with trial counsel but trial counsel ignored him. He said that he and trial counsel never discussed a defense.

On cross-examination, Petitioner agreed that trial counsel and the trial court went over the ten-year plea offer with him approximately six weeks before trial, but he did not understand it. Petitioner claimed that he rejected the offer due to his "lack of understanding." He agreed that he had pled guilty in previous cases with multiple counts, and his rights and sentencing were explained to him by the judge in those cases. Petitioner agreed that in the present case he understood that he could receive a longer sentence by going to trial than the ten-year plea offer. Petitioner also agreed that he did not express any concerns that he had about trial counsel when he met with the trial court before trial regarding the plea offer. He also did not express any concern to the trial court about trial counsel not contacting his alibi witnesses.

Petitioner testified that he asked his mother and sister to meet with trial counsel, and he thought that they made phone calls to him. He thought that they wanted to talk to trial counsel about a potential problem or argument with Petitioner's co-defendant, Mr. Bridges. Petitioner testified that he wanted trial counsel to ask more questions on cross-examination about the fingerprint evidence.

Valerie Jackson, Petitioner's mother, testified that she was living with Petitioner on July 23, 2012. She felt that she had information concerning Petitioner's case that would have helped him. Petitioner's mother testified that she met with trial counsel but he would not say anything to her about Petitioner's case. She said, "When I used to ask him about it it's like he flag [sic] it off. Didn't want to hear what I was talking about." Valerie Jackson also testified that trial counsel did not want to hear any information concerning Petitioner. She said that she would do anything for Petitioner but lie for him. Petitioner's mother testified that she would have told the jury at Petitioner's trial that Petitioner "was at home at that time that they say that he supposed to have did a crime and he did not." She also said that she knew Petitioner was at home because she was home at the time. She said that Petitioner's girlfriend, Andrelica Kelly was at the house, along with Valerie Jackson's other two sons. Petitioner's mother testified that she gave the information to trial counsel but he would not listen. Valerie Jackson testified that she called trial counsel and left messages but he never called her back. She also attended court hearings but trial counsel would not respond to her. She told Petitioner to tell trial counsel to call her but he never called.

On cross-examination, Petitioner's mother testified that she told police that Petitioner was at home with her at the time of the offense. She said that she did not contact the district attorney's office because she did not know the phone number. Petitioner's mother testified that Petitioner was at home with her on January 22, 2005, between 9:00 and 10:00 p.m. On redirect examination, she clarified that he was at home with her on June 22, 2005. When post-conviction counsel pointed out that the offense did not occur in 2005, Petitioner's mother then testified that Petitioner was at home with her on June [sic] 23, 2012. The offense actually occurred on July 23, 2012.

Sharice Jackson, Petitioner's sister, testified that she was at her mother's house on July 23, 2012, with Petitioner. She said that she arrived at the residence at approximately 9:00 to 9:30 p.m., and she was there for "quite some time." She said: "We was all in the house chilling, you know, relaxing, having a good time, family matters." Sharice Jackson testified that she tried to call trial counsel one time but he did not answer. She said: "I used to see him every time we come to court with [Petitioner]. I mean, lack of communication, he wouldn't communicate with us. Like he'll come out [sic] the court and leave." Sharice Jackson testified that they attempted to stop trial counsel in the hallway but he would not stop and talk to them. She did not go to trial counsel's office, and he never called her. Sharice Jackson testified that she would do anything for Petitioner but lie for him.

On cross-examination, Sharice Jackson testified that she was with Petitioner at her mother's house on the date that he was charged in this case. However, she could not remember the exact date. Sharice Jackson then clarified that Petitioner was at home at the time the crime was committed but she could not recall the date. She said that Petitioner was always at his mother's house or at the car wash. Sharice Jackson admitted that she did not tell police or the prosecutor that she was with Petitioner at the time of the offense.

Trial counsel testified that he had practiced law since 1999, and his practice consisted primarily of criminal defense work. He had participated in approximately two dozen or more criminal cases at the time that he represented Petitioner. The majority of the cases involved Class A or B felonies. Trial counsel testified that co-defendant Tommy Bridges was developed as a suspect, and he implicated Petitioner in the offenses. Trial counsel did not feel that the witnesses in the case made a "solid identification" of Petitioner. He said: "The male victim was unable to make an identification and the female victim made a statement that I thought made her's not very solid, that she believed that [Petitioner] was the person . . ." Trial counsel testified that the female victim made a "photograph ID" of Petitioner, and trial counsel challenged the identification on cross-examination. Trial counsel testified that he attempted to discredit the female victim's identification of Petitioner based upon what she initially wrote on the "photo spread." Trial counsel testified: "I felt like that it made it not at the level that was necessary for

beyond a reasonable doubt. And, I mean, and I felt like we cross-examined her thoroughly in regards to that." Trial counsel agreed that the victims followed a vehicle involved in the offense, and the vehicle was later stopped. The passenger, identified as Petitioner, ran from the vehicle, and Co-defendant Bridges was taken into custody from the vehicle. Trial counsel agreed that Co-defendant Bridges' testimony, along with Petitioner identified as running from the vehicle made Petitioner's case more difficult.

Trial counsel testified that he provided discovery to Petitioner, and he met with Petitioner and reviewed it. He thought that a majority of his meetings with Petitioner were at the courthouse and some of the meetings occurred at the jail. Trial counsel testified: "A huge amount of the discussion was around the identifications and how to attack identifications and discussions of [Co-defendant] Bridges' involvement in bringing [Petitioner] into the case."

Trial counsel testified that he remembered Petitioner's mother, Valerie Jackson, because she was present at a majority of the court dates. He did not remember Petitioner's sister "as clearly," but there were other individuals with Valerie Jackson when he spoke to her. Trial counsel also remembered "talking to them numerous times," and the discussions were about "the fact that there was some history with [Co-defendant] Bridges that [sic] made him bring in [Petitioner] out of spite, you know." They also discussed the plea offers. Trial counsel testified that if Valerie Jackson or Sharice Jackson would have provided information that they were with Petitioner at the time of the offense, and how they remembered that day versus any other day, he would have addressed the issue at trial. However, he could not recall any specific discussion about an alibi. Trial counsel testified that he remembered the discussions "being much more tied towards whether we could put on some sort of proof to attack [Co-defendant] Bridges."

Trial counsel noted that there were some communication issues with Petitioner. He said: "[Petitioner] had been under previous mental evaluation, he had had some diagnoses and there was some concern that the communications weren't going where they should." Trial counsel testified that Petitioner was found to be competent but that did not "alleviate" his concerns, and "that's why at somewhere in the record would have been the placing it in front of the Court." Trial counsel thought that both plea offers to Petitioner were placed on record and reviewed with Petitioner. Petitioner rejected the final plea offer which was for ten years. Trial counsel testified that he explained to the best of his ability the potential sentence that Petitioner faced if he went to trial versus the plea offer. He explained consecutive sentencing and the sentencing ranges. Trial counsel testified:

> I mean, I always try to explain things in terms of what the maximum sentence is. And certainly that it's within the judge's discretion whether those things run at the same time or not. Especially in light of the fact that ten[-]year concurrent offer, I mean, when we were discussing it and

it's like, okay, understand when we turn this down that that doesn't have to run concurrent.

Trial counsel was aware of Petitioner's prior criminal record at the time they discussed sentencing and how Petitioner's record could be used in sentencing.

On cross-examination, trial counsel testified that he did not "necessarily" think that Petitioner was "processing" the conversations that they were having about the case. He said:

> I mean, whether we would talk about out of [sic] the case or the offers or his potential liability. I mean, there were, like I said, there was a point in time where I had, I think it was during one of the trial the *voir dire*, and placed on the record that I have a real concern whether he was understanding exactly what was going on. So I mean, there's no doubt. Like I said, yeah, we brought it up during sentencing he's had a predates diagnoses, mental health issues. There was an evaluation that was done at the lower court level that actually instructed for him to be taken for further evaluation.
>
> I mean, we had, we had a lot of discussions about these identifications and this idea of I believe not being enough, which I agreed with [Petitioner] on wholeheartedly. But when it would come time to discuss the what happens [sic] if they take her testimony, then that doesn't work, what's going to happen. And I feel like sometimes things just kind of stopped. I'd keep going but I don't think the conversations went anywhere.

Trial counsel did not recall Petitioner's asking him any questions, and he tried to adequately explain everything to Petitioner. He noted that he and Petitioner got along really well, and he never had any issues with Petitioner. Trial counsel disagreed that he and Petitioner mainly discussed the plea offers and not the facts of the case. He remembered discussing Petitioner's rights with him. Trial counsel testified: "I mean, I think between my discussions with him and then the discussions during the *voir dire* was as comfortable as I could be that he was understanding that. But again, this is what stands out in my mind was putting it on the record that I did have some concerns." Trial counsel testified that he and Petitioner discussed the plea offers. He said: "I sort of do a mathematical analysis, this is the exposure you have if you lose. This is the risk you're taking by giving this up. And that certainly occurred."

*Analysis*

To obtain post-conviction relief, a petitioner must prove that his or her conviction or sentence is void or voidable because of the abridgement of a right guaranteed by the United States Constitution or the Tennessee Constitution. T.C.A.§ 40-30-103; *Howell v. State*, 151 S.W.3d 450, 460 (Tenn. 2004). A post-conviction petitioner bears the burden of proving his or her allegations of fact by clear and convincing evidence. T.C.A § 40-30-110(f); *Dellinger v. State*, 279 S.W.3d 282, 293-94 (Tenn. 2009). "Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009) (quoting *Hicks v. State*, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998). In an appeal of a court's decision resolving a petition for post-conviction relief, the court's findings of fact "will not be disturbed unless the evidence contained in the record preponderates against them." *Frazier v. State*, 303 S.W.3d 674, 679 (Tenn. 2010).

A petitioner has a right to "reasonably effective" assistance of counsel under both the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution. *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). The right to effective assistance of counsel is inherent in these provisions. *Strickland v. Washington*, 466 U.S. 668, 685-86 (1984); *Dellinger*, 279 S.W.3d at 293. When a claim of ineffective assistance of counsel is made, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. *Strickland*, 466 U.S. at 687; see *Lockhart v. Fretwell*, 506 U.S. 364, 368-72 (1993). Failure to satisfy either prong results in the denial of relief. *Strickland* at 697. The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996) (citing *Strickland*, 466 U.S. at 688; *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). Furthermore, the reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, *see Strickland*, 466 U.S. at 690, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. *See Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). The prejudice prong of the test is satisfied by showing a reasonable probability, i.e. a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

Petitioner contends that he received ineffective assistance of counsel because trial counsel failed to adequately communicate with him. More specifically, Petitioner alleges that he was not "clear about what would happen at trial nor was he happy that his trial [counsel] was not having conversations with him about his own case and upcoming trial." Petitioner also asserts that trial counsel did not effectively explain the way that sentencing worked in criminal court and that he did not understand the "law." He further

- 12 -

said that ". . . if I'd known it would have been lesser time I wouldn't even went [sic] to trial [.]"

Concerning this issue, the post-conviction court found that "from appointment to trial," there were seventeen visits between trial counsel and Petitioner which resulted in "sufficient face time with [Petitioner]." The post-conviction court noted that Petitioner was sent for a mental evaluation, and then he was sent for a re-evaluation. The post-conviction court further found:

> Dr. John Whirley, a clinical psychologist, stated as follows in his report dated October 10th:
>
>> After completion of the competency evaluation, I have concluded that he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and a rational as well as factual understanding of the proceedings against him. In making this determination, it is found that the defendant understands the nature of the legal process, the charge against him and the consequences that can follow, and that he can advise counsel and participate in his own defense.
>
> Dr. Whirley also stated that he could not support a defense of insanity.

The post-conviction court recited portions of trial counsel's testimony at the post-conviction hearing and noted that trial counsel testified that at the time he felt that he and Petitioner were not communicating well and that trial counsel was concerned about Petitioner's mental state and that Petitioner might not be processing the conversations that they were having. However, the post-conviction court pointed out that trial counsel "disagreed strongly that he did not go over the facts of the case with Petitioner." Petitioner admitted at the post-conviction hearing that both a twelve-year and then a ten-year plea offer were conveyed to him by trial counsel, and he understood that he could have received more time if convicted at trial. The trial court also reviewed Petitioner's rights with him, and Petitioner said that he understood the ranges of the sentences. The post-conviction court further found:

> Prior to setting the petitioner's case for trial, this court had *voir dired* him thoroughly on the stand under oath, had the prosecutor read the alleged facts to him and then this court went through all of his ranges of punishment with him and told him that the sentences, if convicted, could be ordered served concurrently or consecutively. Once he indicated under oath to the court that he understood, knowing that if he rejected the State's offer and asked for a jury trial that this court would no longer even accept a negotiated plea of guilty, only then did this court set his

- 13 -

case for trial. This court finds that he understood his ranges of punishment and made an informed decision to take his chances with a jury.

Other than the petitioner's complaint that his trial attorney did not interview and call alibi witnesses on his behalf, discussed at allegation 3), below, the petitioner has not suggested any other investigations or preparation that his attorney should have done on his behalf prior to trial, or any other communication that would have yielded something that might have improved the petitioner's chances at trial. During much of the petitioner's testimony at the hearing, both during direct and cross-examination, he contradicted himself several times, saying things that defied belief, such as that he did not recall his prior convictions. [ ]. He categorically denied that his attorney ever struck any jurors, even though his attorney's challenge slips were filed in the jacket with the jurors' names written on them. This court finds the petitioner's testimony not credible, and his attorney's testimony was very straightforward, open and credible.

The record supports the post-conviction court's findings. Contrary to Petitioner's testimony at the post-conviction hearing, trial counsel testified that a majority of his meetings with Petitioner were at the courthouse, and some of the meetings occurred at the jail. He provided discovery to Petitioner, and he met with Petitioner and reviewed it. Trial counsel disagreed that he and Petitioner mainly discussed the plea offers and not the facts of the case. He specifically remembered discussing Petitioner's rights with him. Trial counsel further testified: "I mean, I think between my discussions with him and then the discussions during the *voir dire* was as comfortable as I could be that he was understanding that." Trial counsel said that he explained to the best of his ability the potential sentence that Petitioner faced if he went to trial versus the plea offers. He also explained consecutive sentencing and the sentencing ranges to Petitioner. Trial counsel was aware of Petitioner's criminal record at the time they discussed sentencing and how Petitioner's record could be used in sentencing. Trial counsel testified: I sort of do a mathematical analysis, this is the exposure you have if you lose. This is the risk you're taking by giving this up. And that certainly occurred." At the post-conviction hearing, Petitioner admitted that he understood that he could face more time if he went to trial rather than accepting the plea offer. We also note that Petitioner had entered a guilty plea in a previous unrelated case with multiple counts, and his rights and sentencing were explained to him by the trial court in those cases. Therefore, the proof showed he was familiar with the process.

Despite Petitioner's being found competent to stand trial, trial counsel was concerned that there were some communication issues between himself and Petitioner, and he did not "necessarily" think that Petitioner was "processing" the conversations that

they were having about the case. In order to address his concerns, trial counsel had the plea offers placed on the record, and the trial court reviewed them with Petitioner. The trial court also advised Petitioner of his rights, and Petitioner testified that he remembered the trial court explaining his rights to him. Petitioner rejected the final plea offer and made the decision to go to trial.

We find that Petitioner has not shown by clear and convincing evidence that trial counsel rendered deficient performance by failing to adequately communicate with him. The post-conviction court specifically found that trial counsel's testimony was credible concerning this issue and that Petitioner's testimony was not credible. This Court will not re-weigh or re-evaluate the evidence below. All questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial court, not the appellate courts. *Momon v. State*, 18 S.W. 3d 152, 156 (Tenn. 1999). Petitioner is not entitled to relief.

CONCLUSION

Based on the foregoing, we affirm the judgment of the post-conviction court.

_____
THOMAS T. WOODALL, JUDGE